OPINION
{¶ 1} Appellant, Carla White, appeals from the judgment entry of the Lake County Court of Common Pleas awarding summary judgment in favor of appellees, Brian Fabiniak and Wal-Mart. We affirm.
 {¶ 2} On January 12, 2006, appellant commenced employment as a third shift "in-stock associate" at Wal-Mart in Madison, Ohio. During her training, appellant received an employee handbook defining various company procedures and policies. Of *Page 2 
relevance to the instant case are (1) Wal-Mart's "Open Door" policy for discussing or airing work-related concerns and/or grievances and (2) its "Workplace Violence" policy. The former permits and encourages employees to speak openly with management regarding any employment related problems they experience toward the end of achieving a satisfactory internal resolution of the issue(s). The latter prohibits "harassment, violence, or threats of violence" and, if violated, could result in discipline "up to and including termination from the company." Appellant acknowledged that she received the manual and understood these policies.
 {¶ 3} During her first week of work, appellant alleged she began receiving threatening remarks from another third shift "in-stock" associate, Stephanie Jeppe. According to appellant, Jeppe repeatedly and regularly threatened her with physical violence in the employee break room either before their shift began or during breaks.[1] Appellant testified that, on January 17, 2006, pursuant to the "Open Door" policy, she spoke to Cassie Chuba, the third shift "in-stock" supervisor. Appellant stated she reported that Jeppe was threatening her with physical violence on a daily basis. Appellant testified Chuba was receptive to her complaints and indicated she would sit in the break room and listen. According to appellant, Chuba additionally stated the issue "would be addressed." The record contains no written documentation that this meeting *Page 3 
occurred and, during her deposition, Chuba testified she was never contacted by appellant regarding the matter.[2]
 {¶ 4} Over the next six months, appellant alleged Jeppe continued her practice of threatening her with physical violence. Although Jeppe's alleged conduct bothered appellant, appellant stated she did not level another complaint with management until June 22, 2006. On that date, appellant testified Jeppe had again threatened to "beat [her] fucking ass" and, as a result, she reported the incident to Chuba. Appellant confronted Chuba and explained she had to do something about Jeppe's threatening behavior. Specifically, appellant gave Chuba the following ultimatum: "Either [Chuba] does something about [Jeppe] threatening to beat my fucking ass, or I'm going to slap the piss right out of her."[3] In response, Chuba contacted her manager, Katie Ruben who eventually contacted the store manager, appellee Brian Fabiniak. Appellant was told to return to work and approximately an hour after the incident, she was notified by Chuba that she was being suspended from work as a result of the verbal threat.
 {¶ 5} On June 30, 2006, appellant was asked to attend an interview with Mr. Fabiniak. During the meeting, appellant explained that Jeppe had threatened her approximately 120 times since she started her employment at Wal-Mart. While appellant admitted she threatened to "slap the piss" out of Jeppe if Chuba did not *Page 4 
resolve the problem, she acknowledged that she had not previously reported the problem to a manager or hourly supervisor. Appellant was given an incident report in order to provide a statement of what, in her view, occurred to prompt her report and subsequent threat. Nowhere in her statement did appellant indicate that Jeppe had threatened her with violence on or prior to June 22, 2006. Appellant's statement specifically read:
 {¶ 6} "On Tuesday evening I came to work around 9:40 p.m. I went into the break room and sat at a table with two cashiers from seacond [sic] shift. Over in the corner sat, Holly[,] Stephany [sic], [and] Lois. Holly got up[,] left the breakroom for a second and came back in and said something to Stephanie about did you take care of the situation with her over there across the table? I look up to light my cigarette and they were looking at me. Stephanie's reply was I'm fucking sick and tired of her running to Brian and telling him I get speacial [sic] treatment when Steve works. I got up left the break room when [sic] to Cassie and told her I need to talk to her after the meeting. After the meeting Cassie asked me what was wrong[.] I told [her] I had have [sic] enough of Stephanies [sic] mouth [and] something needed to be done about it or I was gonna slap the piss out of her. Cassie told me not to do that because I would go to jail or loose [sic] my job. She said she had to call Katie because she wasn't sure how to handle it. Katie came in the room and asked me what was going on and I told her the same thing[.] She said it would be handled she would go to the sorce [sic]. I told her I felt better because I vented and she said good. So I went to work about and [sic] hour later Katie came to me and said I was suspended. So I went home." *Page 5 
 {¶ 7} On the page following appellant's statement, the incident report asked appellant: "Other than the incidents you described above, did you or anyone else say or do anything else that you or another person considered or might reasonably have considered to be inappropriate or offensive?" Notwithstanding appellant's representations regarding Jeppe's pattern of threatening conduct, appellant responded in the negative. At her deposition, appellant admitted she was given the opportunity to detail Jeppe's alleged daily threats but did not. Shortly after her interview with Fabiniak, appellant was fired for threatening an associate.
 {¶ 8} On July 6, 2006, three days after her termination, appellant filed a police report with the Madison Township Police Department. In her report, appellant stated Jeppe had threatened her with physical violence in January of 2006. Her report further stated that Jeppe would regularly "run her mouth on [appellant]." Appellant further reported that, on the day she was suspended, she reported the incident, told the supervisor something needed to be done "or [she would] slap the piss out of [Jeppe]."
 {¶ 9} On September 21, 2006, appellant filed suit against appellees Wal-Mart and her former manager Brian Fabiniak alleging breach of an employment contract, discharge in retaliation for use of Ohio's Whistleblower statute, and discharge in violation of Ohio public policy. After discovery, appellees moved for summary judgment which appellant duly opposed. On June 19, 2007, the trial court granted summary judgment in appellees' favor.
 {¶ 10} Appellant now appeals and assigns three errors for our consideration. Her first assignment of error states: *Page 6 
 {¶ 11} "Where an employee's handbook establishes an open door policy, recognized as valid by both employer and employee, an implied employment contract is created, sufficient to permit the exercise of such policy by the employee. Termination for her use of that policy violates that contract. Recognition by both parties of the open door policy establishes a `meeting of minds' sufficient to deny summary judgment to the employer."
 {¶ 12} We review a trial court's decision to grant summary judgment de novo. Grafton v. Ohio Edison Co., 77 Ohio St.3d 102, 105, 1996-Ohio-336. Summary judgment is appropriate under Civ. R. 56(C) when (1) there is no genuine issue of material fact remaining to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing the evidence in favor of the nonmoving party, that conclusion favors the moving party. Temple v. Wean United, Inc. (1977),50 Ohio St.2d 317, 327.
 {¶ 13} The moving party bears the initial burden of providing the trial court a basis for the motion and is required to identify portions of the record demonstrating the absence of genuine issues of material fact pertaining to the non-moving party's claim. Dresher v. Burt,75 Ohio St.3d 280, 293, 1996-Ohio-107. The burden then shifts to the non-moving party to set forth specific facts that would establish a genuine issue for trial. Id. The moving party cannot discharge its initial burden under Civ. R. 56 simply by making a blank assertion that the nonmoving party has no evidence to prove its case but must be able to specifically point to some evidence of the type listed in Civ. R. 56(C). *Page 7 Dresher. Similarly, the non-moving party may not rest on conclusory allegations or denials contained in the pleadings; rather, he or she must submit evidentiary material sufficient to create a genuine dispute over material facts at issue. Civ. R. 56(E); see, also, Dresher.
 {¶ 14} To determine whether a genuine issue exists, a reviewing court must determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must necessarily prevail as a matter of law. Spatar v. Avon OaksBallroom, 11th Dist. No. 2001-T-0059, 2002-Ohio-2443, at ¶ 16, citingTurner v. Turner, 67 Ohio St.3d 337, 340, 1993-Ohio-176. "As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."Anderson v. Liberty Lobby, Inc. (1986), 477 U.S. 242, 248.
 {¶ 15} Under her first assignment of error, appellant argues Wal-Mart's "benefits, 2005 Associate Guide" employee handbook, which sets forth an employee's right to exercise an "open door" policy for reporting grievances to superiors, created a contract concerning the use of the policy in the context of the employment relationship which was breached when Wal-Mart terminated her employment. Specifically, the "open door" policy states an employee can address his or her problems to management without fear of retaliation. Appellant interprets this provision to imply that an employee who chooses to use the policy is guaranteed continued employment irrespective of the nature and *Page 8 
substance of the communication between the employee and management. We disagree.
 {¶ 16} Appellant was an at-will employee of Wal-Mart. The employment at-will doctrine allows either party to terminate the employment relationship at any time and for any reason not contrary to the law unless otherwise agreed. Mers v. Dispatch Printing Co. (1985),19 Ohio St.3d 100, paragraph one of the syllabus. However, the employment at-will doctrine is only a description of the parties' prima facie employment relationship. Helle v. Landmark, Inc. (1984),15 Ohio App.3d 1, 8. As such, in Mers, the Supreme Court acknowledged there are certain limitations on an employer's discretion to terminate an employee. One such limitation is the existence of an implied or express agreement which alters the terms of the employment relationship. Id. at paragraph two of the syllabus; see, also, Brown v. Lowe's, Inc. 11th Dist. No. 2003-T-0059, 2004-Ohio-5457, at ¶ 47.
 {¶ 17} An employer's promulgation of employment manuals, employee handbooks or other written guidelines elucidating policies or practices may be evidence of the existence of subsidiary agreements internal to the employment relationship. Mers, supra, at 104; see, also,Helle, supra. However, the mere existence of a handbook is not dispositive evidence of a subsidiary employment agreement. Rather, to create an enforceable subsidiary agreement in the context of an employment at-will relationship there must be a meeting of the minds or mutuality of assent on behalf of both parties. Brown, supra, at ¶ 49. Accordingly, "an employee who asserts the existence of an implied contract must prove the existence of each element necessary *Page 9 
for the formation * * * of a contract, including, offer, acceptance, consideration, and mutual assent." Id. at ¶ 50, citing Tersigni v. Gen.Tire, Inc. (1993), 91 Ohio App.3d 757, 760.
 {¶ 18} Here, the "open door" policy is discussed in the "2005 Associate Guide" first under the heading "Union Philosophy," which states:
 {¶ 19} "At Wal-Mart, we respect the individual rights of our Associates and we encourage everyone to express their ideas, suggestions, comments, and concerns. Because we believe in maintaining an environment of open communications through the use of the Open Door, we do not believe there is a need for third-party representation. We are not anti-union; we are pro-Associate. It is our position that every Associate can speak for himself or herself without having to pay hard-earned money to a union in order to be listened to and have issues resolved."
 {¶ 20} The policy is then defined under the heading "Open Door Policy," which provides:
 {¶ 21} "If you have an idea or a problem, you can talk to your supervisor about it without fear of retaliation. Problems may be resolved faster if you go to your immediate supervisor first. However, if you feel your supervisor is the source of the problem, or if the problem has not been addressed satisfactorily, you can go to any level of management in the Company. But remember, while the Open Door promises that you will be heard, it cannot promise that your request will be granted or that your opinion will prevail." *Page 10 
 {¶ 22} The policy provides an avenue an employee may use in the event he or she has a work related concern, idea, or grievance. Within the context of the policy, therefore, Wal-Mart admits it will not terminate or otherwise punish an employee for choosing to share his or her ideas or problems with management. Read plainly, this is neither an implied or express promise of continued employment. Rather, it is merely an assurance that an employee can utilize the policy without concern of unfair reprisals on behalf of management or the company at large.
 {¶ 23} Here, the record indicates appellant was specifically fired for violating the workplace violence policy. The workplace violence policy explicitly prohibits "harassment, violence, or threats of violence." The policy underscores that "[a]ny associate who violates this policy will be disciplined up to and including termination from the company." At her deposition, appellant testified she was aware she was terminated for violating the above policy; she further testified she knew, while still an employee of Wal-Mart, she could be terminated if she engaged in threats of violence. Finally, she testified she knew, while still an employee, that it was a violation of Wal-Mart's workplace violence policy to threaten to "slap the piss" out of another.
 {¶ 24} Viewing the record as a whole and in a light most favorable to appellant, we hold the plain meaning of the open door policy assured an employee he or she would not be retaliated against for utilizing it as a means to air his or her grievances. This does not imply the policy guaranteed an employee continuous employment if, for example, he or she breached a separate policy set forth in the manual in the course of utilizing the open door policy. In short, nothing in the "2005 Associate Guide" indicated *Page 11 
an employee who uses the open door policy is somehow relieved of his or her obligation to respect other Wal-Mart policies while communicating a problem.
 {¶ 25} Appellant, in attempting to use the open door policy, simultaneously threatened Jeppe with physical harm in direct violation of the workplace violence policy, a policy that, if violated, could lead to termination. In her incident report, appellant admits that her threat was neither made in response to a similar threat by Jeppe nor was it made in response to any alleged past threats. Rather, her written report provided that Jeppe had become irritated with appellant due to appellant's alleged assertions that Jeppe was receiving favorable treatment. Instead of talking to Chuba about Jeppe's conduct and seeking a satisfactory resolution pursuant to the open door policy, appellant overtly threatened to physically strike Jeppe. Nothing in the open door policy states that an aggrieved employee who decides to use the policy may utilize or threaten to utilize vigilante tactics if a particular supervisor does not handle the grievance in a manner the employee demands. Quite the contrary, the policy provides that, while an employee will assuredly be heard, an employee's view or opinion regarding the resolution of a problem will not always prevail.
 {¶ 26} Appellant does not specifically allege Chuba refused to hear her complaint, nor did she provide any evidence that her termination was retaliatory in nature. Appellant acknowledges, and the record demonstrates, she was fired for threatening Jeppe in violation of the workplace violence policy. Nothing in the record indicates Wal-Mart acted inappropriately in terminating appellant on this basis. Thus, *Page 12 
there is no genuine issue of material fact as to appellant's allegation that Wal-Mart, through Fabiniak, acted contrary to or in violation of any express policy.
 {¶ 27} Appellant's first assignment of error is without merit.
 {¶ 28} Appellant's second assignment of error states:
 {¶ 29} "Where an employee orally informs her employer of repeated threats of assault by a co-employee and the employer records those statements in writing the oral and written statement requisites of R.C. 4113.52 have been satisfied."
 {¶ 30} R.C. 4113.52, Ohio's whistleblower statute, prohibits an employer from taking disciplinary or retaliatory action against an employee for reporting violations of the law. Protection as a whistleblower requires an employee's strict compliance with the dictates of R.C. 4113.52. Contreras v. Ferror Corp. (1995), 73 Ohio St.3d 244,246-247. Appellant argues she put forth sufficient evidence of her compliance with the requirements of R.C. 4113.52(A)(3) to avoid summary judgment. R.C. 4113.52(A)(3) provides:
 {¶ 31} "If an employee becomes aware in the course of the employee's employment of a violation by a fellow employee of any state or federal statute, any ordinance or regulation of a political subdivision, or any work rule or company policy of the employee's employer and the employee reasonably believes that the violation is a criminal offense that is likely to cause an imminent risk of physical harm to persons or a hazard to public health or safety, a felony, or an improper solicitation for the contribution, the employee orally shall notify the employee's supervisor or other responsible officer of the employee's employer of the violation and subsequently shall *Page 13 
file with that supervisor or officer a written report that provides sufficient detail to identify and describe the violation."
 {¶ 32} Here, appellant asserts in her brief that she orally reported the alleged threats "on a number of occasions over six months." Appellant's testimony, as well as Cassie Chuba's testimony, contradicts this representation. During her deposition, appellant testified she reported the problem to Chuba on January 17, 2006, but did not make any additional reports to any management personnel for the next six months. Chuba denied appellant ever spoke with her about Jeppe making threatening remarks. However, assuming the report was made, as we are required to do for purposes of summary judgment review, the record contains no written documentation of this meeting. Accordingly, the alleged report filed on January 17, 2006 fails to strictly comply with the procedures set forth in the statute.
 {¶ 33} Next, on June 22, 2006, appellant had an exchange with Jeppe after which she advised Chuba that if something was not done to address Jeppe's alleged harassing conduct, appellant would "slap the piss out of [Jeppe]." After appellant delivered this ultimatum, she was suspended from work and, several days later, had an interview with Fabiniak. During this interview, appellant had an opportunity to memorialize her concerns in writing. In her statement, however, nowhere does she mention Jeppe's alleged continuous pattern of threatening conduct. Moreover, even though she was provided a space to detail additional or past incidents of inappropriate conduct, she denied any such incidents occurred. A review of appellant's statement does not indicate appellant was threatened, by Jeppe, with physical violence; rather, the *Page 14 
only threat mentioned in the statement is appellant's assertion that she "had enough of [Jeppe's] mouth" and would slap Jeppe if management did not do "something."
 {¶ 34} Although the allegations surrounding the June 22, 2006 incident are somewhat vague, viewed in a light most favorable to appellant, we believe there is sufficient evidence to create a genuine issue of material fact as to whether she orally notified her supervisor of the alleged violation.4 However, the written report fails to provide the necessary details to support her allegation that Jeppe had threatened her with physical violence, either on June 22, 2006 or ever. As just discussed, the only discernable threat set forth in the written report was leveled by appellant and was directed at Jeppe. Appellant did not strictly follow the procedural steps necessary to invoke the protection of the Whistleblower statute. Thus, appellant has failed to demonstrate a genuine issue of material fact relating to this issue and therefore appellees are entitled to judgment as a matter of law.
 {¶ 35} Appellant's second assignment of error is without merit.
 {¶ 36} Appellant's third assignment of error reads:
 {¶ 37} "Public policy in Ohio permits a citizen to notify her employer of workplace threats of assault by co-workers without fear of termination from employment."
 {¶ 38} Under her final assignment of error, appellant asserts the trial court erred in awarding summary judgment on her public policy claim because, even if her R.C.
4. It is worth noting, notwithstanding the mechanics of Civ. R. 56, that Richard Pohto, another third shift employee, testified via deposition that he heard Jeppe threaten appellant; however, Pohto testified he never reported the incident or incidents to management. Thus, save appellant's self-serving statements regarding Jeppe's conduct, there is no evidence that management had any knowledge or notification of the alleged threats. *Page 15 
4113.52 whistleblower claim fails, there is a genuine issue of material fact as to whether appellees violated Ohio public policy pursuant to Section 1 of the Ohio Constitution. We disagree.
 {¶ 39} Section1 of Ohio's Constitution provides:
 {¶ 40} "All men are, by nature, free and independent, and have certain inalienable rights among which are those of enjoying and defending life and liberty, acquiring, possessing, and protecting, and seeking and obtaining happiness and safety."
 {¶ 41} Appellant fails to elucidate how her termination for threatening a fellow employee with physical violence contrary to Wal-Mart's workplace violence policy flies in the face of the foregoing Constitutional protections. For this reason alone, her argument fails. However, even had appellant substantively defined her assertions, we need not consider the underlying claim because it was not before the trial court.
 {¶ 42} Appellant's complaint only alleged a public policy violation pursuant to R.C. 4113.52. In its judgment entry, the trial court set forth the elements of a public policy claim discussed in Greeley v.Miami Valley Maintenance Contrs., Inc. (1990), 49 Ohio St.3d 228. The first element of a Greeley claim requires a claimant to establish a clear public policy manifested in a statute, constitution, administrative regulation, or in common law. Here, appellant's claim was strictly based upon the policies embedded in R.C. 4113.52. Appellant could have pleaded or asserted her public policy claim based upon a purported violation of Ohio's Constitution in the trial court. See, e.g., Leininger v. Pioneer National Latex, 115 Ohio St.3d 311, 316,2007-Ohio-4921 (noting that *Page 16 
"remedies available under R.C. 4113.52 [are] not adequate to fully compensate an aggrieved employee" citing Kulch v. Structural Fibers,Inc. (1997), 34 Ohio St.3d 134, 155, 1997-Ohio-219). She did not do so. A party may not raise a claim for the first time on appeal. Barnes v.Andover Vill. Ret. Cmty., Ltd., 11th Dist. No. 2006-A-0039,2007-Ohio-4112, at ¶ 30, citing, Sekora v. General Motors Corp. (1989),61 Ohio App.3d 105, 112-113. In keeping with this well-settled principle, we decline to address the substantive merits, if any, of appellant's final argument. Because appellant's R.C. 4113.52 claim must fail, her public policy claim must likewise fail.
 {¶ 43} Appellant's final assignment of error lacks merit.
 {¶ 44} Pursuant to the foregoing analysis, appellant's assignments of error are overruled and, as a result, appellees are entitled to judgment as a matter of law. The judgment of the Lake County Court of Common Pleas is accordingly affirmed.
MARY JANE TRAPP, J., concurs.
COLLEEN MARY OTOOLE, J., concurs in judgment only.
[1] Appellant testified Jeppe expressed her intent to "beat [appellant's] fucking ass" on a daily basis. While the specific phraseology of the alleged threats varied, the substance remained the same. According to appellant, the women had no prior disagreement and, in fact, did not know one another before their mutual employment at Wal-Mart. Consequently, appellant could not explain Jeppe's alleged hostilities toward her.
[2] Chuba (who, at the time of her deposition, was no longer working at Wal-Mart) testified that appellant had informally told her she did not like Jeppe. However, Chuba testified she was certain appellant had never complained about Jeppe threatening her. Chuba stated any report of threatening behavior is labeled a "Red Book Issue" and is taken very seriously because it represents grounds for possible termination.
[3] Although appellant's ultimatum suggests that she would slap Chuba, all parties agree the threat was directed at Jeppe. *Page 1